1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DUKE YOUNG, an individual, and K221, LLC, a Washington State limited liability company, | CASE NO. 20-CV-01816-LK |
| Plaintiffs, | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| v. | |
| SAFECO INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

This matter comes before the Court on Defendant Safeco Insurance Company of America's Motion for Summary Judgment, Dkt. No. 40, and Plaintiffs Duke Young and K221, LLC's Motion for Partial Summary Judgment, Dkt. No. 43. For the reasons set forth below, the Court grants in part and denies in part Safeco's motion and denies Plaintiffs' motion.

## I.    BACKGROUND

This insurance dispute arises out of a death at Duke Young's rental property in Kirkland, Washington. Young purchased the property in July 2015. *See* Dkt. No. 41 at 7–22. He obtained a

1   Landlord Protection Policy (the "Policy") from Safeco shortly thereafter and, in February 2018,

2   began renting the premises to a tenant. Dkt. No. 41 at 24–30, 202–230. The house was in "terrible"

3   condition when the tenant and his fiancé moved in.[1] *Id.* at 35:13.

4           The Insurance Policy

5           Relevant here are three Policy provisions. First, the Policy promises that Safeco will insure

6   direct physical loss caused by "[v]andalism or malicious mischief" unless the loss falls under one

7   of the enumerated General Exclusions (Perils Insured Against – Coverage C – Personal Property).

8   *Id.* at 209. Second, one such General Exclusion bars coverage for "[p]lanning, [c]onstruction or

9   [m]aintenance," which is defined as "faulty, inadequate or defective . . . workmanship, repair,

10  construction, renovation, [or] remodeling . . . of the property . . . by any person or organization"

11  (General Exclusion No. 10). *Id.* at 212. The third and final relevant provision sets forth several

12  "duties" that the insured "must perform" in the event of a loss (General Condition No. 4). *Id.* at

13  213. These duties include, but are not limited to, "cooperat[ing] with [Safeco] in the investigation

14  . . . of any claim" (General Condition No. 4(a)); "mak[ing] reasonable and necessary repairs

15  required to protect the property and keep[ing] an accurate record of repair expenses" (General

16  Condition No. 4(d)); and "prepar[ing] an inventory of the loss to the building and damaged

17  personal property showing in detail the quantity, description, *actual cash value* and age"[2] (General

18  Condition No. 4(e)). *Id.* at 213 (emphasis in original). Of particular import here, though, is the

19  insured's obligation to "provide [Safeco] with records and documents [it] request[s]" and to

20

21  [1] The lease addendum makes no guarantees with respect to the condition of the home and specifies that Young "kn[ew]
    little about [the] property." Dkt. No. 41 at 30. Moreover, and according to the addendum, the tenant worked "in
22  construction," inspected the home "to his satisfaction," assured Young that the home was "safe," and assumed "all
    liability [and] responsibility for [the] condition of the home[] and it's [sic] surroundings." *Id.*

23  [2] When damage to property is "economically repairable," the Policy defines "actual cash value" to mean "the cost of
    materials and labor that would be necessary to repair the damage, less reasonable deduction for wear and tear,
24  deterioration and obsolescence." Dkt. No. 41 at 217.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 2

1    "exhibit the damaged and undamaged property" to Safeco "as often as [Safeco] reasonably

2    require[s]" (General Condition No. 4(f)(1)–(2)). *Id.*

3           <u>Young's Insurance Claims</u>

4           In April 2019, the tenant passed away in one of the bedrooms of the rental house. *Id.* at 72–

5    73.[3] Young subsequently inspected the property and "discovered" that the tenant had made several

6    "unauthorized modifications." Dkt. No. 43 at 3. The lease agreement prohibits "alterations or

7    improvements to the Property without [Young]'s prior written approval." Dkt. No. 41 at 25.

8    Although Plaintiffs frame the tenant's renovations as a surprise, the record suggests otherwise. The

9    tenant's fiancé testified during her deposition that Young authorized the renovations and even

10   accepted the work in lieu of rent. Dkt. No. 41 at 36:15, 38:22–24. The tenant replaced, among

11   other things, the rotting bathroom floor, tub, basin, and toilet. *Id.* at 36:14–15.[4] He also enlarged

12   the closets in both bedrooms, sealed two bedroom doors leading to a shared bathroom, and erected

13   walls in the living room to create a third bedroom. Dkt. No. 40 at 3; *see also id.* at 4 (diagram);

14   Dkt. No. 41 at 84–115 (Safeco's inspection photographs). Plaintiffs further allege that the tenant

15   opened, reframed, or wholesale removed other walls in the house, removed the structural support

16   for the fireplace, tore out the wood-burning stove, and altered sections of the plumbing and

17   electrical wiring. Dkt. No. 41 at 41:39–41, 42:42–45. Although the parties dispute the extent of

18   the tenant's remodeling efforts, the Court need not resolve the disagreement. It suffices to say that

19   Plaintiffs claim that they "didn't recognize" the house and that the tenant "reconfigured the whole

20

21   _____

     [3] The police report indicates that law enforcement did not suspect foul play. *See* Dkt. No. 41 at 72–82. Safeco notes
22   that the cause of death was carbon monoxide poisoning. Dkt. No. 40 at 4. This observation appears to be based on
     Young's representations to a Safeco investigator during the ensuing inspection. *See* Dkt. No. 14-1 at 22 ("Duke
     confirmed tenant passed away recently . . . due to carbon monoxide poisoning from generator in c/space?").

23   [4] When multiple deposition transcript pages appear on one ECF page, the Court cites to the docket number, ECF page
24   number(s), and transcript page number(s)—in that order. For example, this citation refers to docket number 41, ECF
     page 36, and deposition pages 14 and 15.

house to meet his needs." *Id.* at 41:40, 43:49.

Young submitted a claim to Safeco seeking coverage for repairs associated with the tenant's remodeling work (the "vandalism claim"). Dkt. No. 40 at 4.[5] On April 26, 2019, Safeco conducted an inspection of the property and concluded that the claimed loss was due to "incomplete/unauthorized home renovations by tenant." Dkt. No. 14-1 at 22. Safeco's on-site investigator explained to Young the "difference between vandalism/malicious mischief" and "wear/hard living/incomplete renovations[.]" *Id.* And because there was "no evidence of malicious intent related to [the] unauthorized home renovations," the investigator denied coverage for the claimed loss. *See id.* ("Coverage Analysis: Coverage excluded for incomplete/unauthorized home renovations by tenant, wear, hard living, [and] long-term water damage[.]").

Young mounted a spirited objection to Safeco's initial denial. The record indicates that at least one claims adjuster had an escalated call with him days after the inspection. *Id.* at 21; Dkt. No. 43 at 4 ("Mr. Young repeatedly challenged Safeco's decision, explaining that regardless of whether [the tenant] intended to harm the Rental Property, the Lease forbid him from knocking down and altering walls." (footnote omitted)). Safeco responded by requesting a copy of the lease agreement "to determine how it read[] pertaining to the interior remodeling/removal and additions of the property[.]" Dkt. No. 14-1 at 21. Safeco's review of the lease, however, did not alter its position. *Id.* at 20. And on May 6, 2019, it issued a formal letter denying coverage. Dkt. No. 41 at 121. The letter summarily explains that the Policy "does not afford coverage for damage(s) which arise out of wear, tear, deterioration, construction renovation, remodeling, maintenance and rot."

---

[5] Young also submitted a claim for loss incurred during the cleanup and removal of the tenant's personal property (the "biohazard claim"). *Id.*; *see also* Dkt. No. 41 at 119 (itemized invoice submitted to Safeco for biohazard removal totaling $3,317.48). Although Safeco originally denied this claim, Dkt. No. 41 at 117, it later accepted coverage and paid the full amount of the claimed loss, minus a deductible, *id.* at 134–37. Plaintiffs "do[] not intend to pursue any claims against Safeco . . . relating to the biohazard claim." Dkt. No. 50 at 4 n.1.

1   *Id.* It also includes two pages of reproduced Policy excerpts, including General Exclusion No. 10

2   (excluding repair, construction, renovation, and remodeling work). *See id.* at 122–23. The letter

3   concludes by instructing Young to "please begin the repair process as soon as possible" to protect

4   his property from further loss. *Id.* at 123.

5          According to Plaintiffs, Young "complied" with this directive. Dkt. No. 43 at 5. The extent

6   of the tenant's alterations, however, was not apparent until Young "removed some of the drywall

7   sheetrock" and exposed the improperly reframed interior walls, inadequate structural support, and

8   rewired electrical system. Dkt. No. 44 at 2. The unforeseen scale of the repair work apparently

9   inspired Young to "perform other work at the Rental Property to make the home more desirable."

10  *Id.* And because Safeco had already denied his claim, he reasoned that it was "more efficient and

11  cost-effective" to perform the repairs and remodel work concurrently. *Id.* at 2–3; *see also* Dkt. No.

12  43 at 5 ("Because of the significant amount of repair work required, Mr. Young decided to remodel

13  other parts of the Rental Property at the same time."). Young started the repair work in "[l]ate

14  Spring 2019." Dkt. No. 50 at 3; *see also* Dkt. No. 41 at 159–61 (City of Kirkland building permit

15  issued on July 16, 2019, and limited in scope to "replacing roof, overlaying sheetrock over existing

16  walls and replacing windows"). But he did not obtain the architectural plans, structural engineering

17  plans, or building permit for the major remodeling work until July 2020.[6] *See* Dkt. No. 41 at 144

18  (contractor estimate referring to a building permit issued on July 6, 2020); *id.* at 147–52

19  (architectural plans dated July 2020); *id.* at 153–57 (engineering plans dated July 2020).

20         Young's IFCA Notice

21         On August 10, 2020, fifteen months after Young's vandalism claim was formally denied,

22

23  _____

24  [6] In fact, in October 2019 Young received a "stop work" order from the City's Planning and Building Department
    when his remodeling efforts exceeded the scope of the initial July 2019 permit. *See* Dkt. No. 41 at 54:88–89; Dkt. No.
    22-3 at 7.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 5

his counsel sent Safeco a 20-day notice of intent to sue under Washington's Insurance Fair Conduct Act ("IFCA"). *Id.* at 127–30; *see* Wash. Rev. Code § 48.30.015(8)(a). The notice criticized at length Safeco's interpretation of the Policy's vandalism provision and defective construction exclusion, and alleged that Safeco's denial of coverage was "manifestly unreasonabl[e]." *See* Dkt. No. 41 at 128–29. Safeco's attorney responded to the notice 18 days later in an email indicating that Safeco had agreed to "cure" its initial denial and "accept coverage" for Young's loss. *Id.* at 132. Safeco's counsel also requested an estimate of the cost to repair the tenant's unauthorized renovations. *Id.*

Safeco's request for an estimate remained pending through early October 2020, when it advised Young's attorney that "a re-inspection w[ould] be needed . . . to capture data regarding damages." *Id.* at 139. Although Safeco had "agreed to address interior damage (vandalism)," it "[r]emin[d]ed" counsel of its "right to inspect the property." *Id.* Counsel responded by indicating that Young "was not interested in a second inspection." *Id.* He nonetheless agreed to "reach out" to Young and "follow up" with Safeco afterwards. *Id.* Safeco subsequently issued a letter to Young and his attorney reserving its right to "amend or supplement [its] coverage position" pending further investigation. Dkt. No. 51-1 at 2. This letter set forth the Policy's vandalism provision and enumerated every duty that an insured must fulfill following a loss. *See id.* at 3. Perhaps most importantly, though, the letter identified the basis for Safeco's reservation of rights: Young's failure to abide by General Condition No. 4(f)(1), which obligates the insured to "exhibit the damaged and undamaged property" as often as Safeco reasonably requires. *Id.* at 4. Safeco concluded by promising to continue its investigation and urging Young to provide "any information relative to the loss[.]" *Id.*

On October 28, 2020, Young's counsel provided Safeco an estimate along with a letter formally denying its request for a second inspection. Dkt. No. 41 at 141–42, 144–45. The letter

1    asserted that Safeco breached the Policy by unreasonably denying Young's vandalism claim,

2    which in turn relieved him of any obligation to provide access to his property. *Id.* at 141–42. The

3    estimate from CJ McLeod Construction totaled the "[r]epair and remodel" costs at $222,138, an

4    amount that included—but was not limited to—costs for foundation work ($14,586); framing and

5    new support ($26,740); roofing ($13,500); siding ($9,100); windows and doors ($11,034);

6    insulation ($5,240); kitchen cabinets, tile, countertops, and appliances ($26,750); and flooring

7    ($7,480). *See id.* at 144–45.

8          Safeco's counsel responded roughly a month later to "make its position clear" with respect

9    to coverage for the vandalism claim. Dkt. No. 45-3 at 2. Counsel pointed out that Safeco "agreed

10   to cure any alleged IFCA violation and accept coverage for the loss, to the extent the insured was

11   claiming that the tenant's renovations were not approved by the insured, and he desired for the

12   home to be put back in its initial original condition." *Id.* Safeco did not, however, "agree to pay

13   for an unreasonable estimate submitted by the insured for repairs that appear to be wholly unrelated

14   to any vandalism caused by the tenant." *Id.* As counsel further observed, Young's estimate

15   "appear[ed] to go well beyond any damage caused by the tenant," the "most glaring example" of

16   which was the foundation work. *Id.* at 3 ("Similarly, it is unclear why replacement of the roof

17   would be required to put the house back in the condition [it was in] before the tenant performed

18   his work.").[7] Counsel last emphasized Safeco's entitlement "to determine which damages were

19   caused by the loss" and again requested an inspection. Dkt. No. 45-3 at 3. He warned that if Young

20   declined the inspection, Safeco would "make its best estimate, based upon the photos it took during

21   its investigation, to identify those area[s] that appear to have been caused by the tenant, and pay

22   for those damages accordingly." *Id.* Opposing counsel did not respond. Dkt. No. 48 at 5.

23

24   _____

[7] Plaintiffs' engineering expert, Lee Dunham, subsequently testified that "some portion" of the foundation work was necessary to remedy the tenant's alterations. Dkt. No. 41 at 59:106.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 7

1

<u>Plaintiffs File Suit</u>

2
     Plaintiffs sued Safeco in December 2020 for declaratory relief, breach of contract, bad

3 faith, and violations of IFCA and Washington's Consumer Protection Act ("CPA"). Dkt. No. 1 at

4 4–7. Then, 15 months passed. The parties offer divergent views of this period. Plaintiffs

5 characterize it as a smear campaign against Young and an orchestrated effort to delay payment for

6 the vandalism claim. *See, e.g.*, Dkt. No. 43 at 7 ("Safeco initiated a litigation campaign against

7 Mr. Young, challenging the coverage that it admitted it owed and focusing the majority of its

8 efforts on making accusations that Mr. Young was lying about who caused the damage, had

9 purposefully destroyed evidence, and worse."). Safeco, on the other hand, maintains that Plaintiffs

10 are to blame for the delay because they filed suit instead of cooperating with Safeco during the

11 valuation process. *See* Dkt. No. 48 at 5. According to Safeco, it was forced to use discovery as a

12 means of obtaining information that Young refused to provide. *Id.*

13
     Safeco deposed Plaintiffs' architect, engineers, engineering expert, and contractor. *Id.*

14 Most of Safeco's questioning sought to distinguish Young's remedial work from his allegedly

15 gratuitous renovations. *See id.* at 15 ("This discovery was overwhelmingly aimed at challenging

16 (successfully) the accuracy of the estimate plaintiffs submitted in October of 2020."). For example,

17 Lee Dunham (Plaintiffs' engineering expert), testified that some of the work itemized in the

18 October 2020 estimate was unrelated to the tenant's unauthorized alterations and thus unnecessary

19 to remedy the damage. *See* Dkt. No. 41 at 51:53, 52:54 (two of four PSL beams installed by Young

20 unrelated and unnecessary); *id.* at 55:92–93 (installation of new walls unrelated and unnecessary);[8]

21 *id.* at 57:98–99, 63:120–21 (installation of two outside decks, moving bathroom, converting

22 kitchen into master bedroom, converting living room into kitchen, construction of new laundry

23 _____

24 [8] However, Dunham testified that it was necessary to repair or replace the walls altered by the tenant. Dkt. No. 41 at 55:92–93. This includes the walls that contained tampered-with electrical wiring. *Id.*

1   room and associated re-plumbing all unrelated and unnecessary); *id.* at 62:117, 63:118 (installation

2   of new siding, windows, and doors mostly unrelated and unnecessary).

3       Safeco tracked this strategy with respect to Young's deposition. There, Young conceded

4   that not all the remodeling work was remedial. Nor could he specify which work was related to

5   the tenant's unauthorized alterations. *See id.* at 46:121 (Q: "Do you believe that all of that work

6   was necessary to remedy [the tenant]'s alterations?" A: "I think part of it was." Q: "Okay. Which

7   part of it isn't?" A: "I don't have an answer for you."); *id.* at 45:74 ("I wasn't documenting

8   everything because I didn't think that I had any support from anybody, especially Safeco, because

9   my claim was denied."). Meanwhile, Plaintiffs deposed several Safeco representatives. They

10  elicited testimony suggesting that Safeco could have estimated repair costs without an inspection

11  but failed to do so. *See* Dkt. No. 51-2 at 7–8 (Q: "If Safeco disagrees with your coverage evaluation

12  that a loss is not covered, what happens then?" A: "[T]hey would direct me to then write an

13  estimate based on the damages specific to whatever the cause of loss is." Q: "And has anybody

14  ever reached out to you about doing something like that with respect to Mr. Young's claim?" A:

15  "No." Q: "Nobody has ever reached out to you and asked you to revise this estimate to include the

16  damages or to estimate the damage that you saw?" A: "No.").

17      Indeed, Safeco hired an expert in March 2022 to do just that. Dkt. No. 43 at 11; Dkt. No.

18  45-8 at 3. This expert, Mark Lawless, testified that an inspection at the time of his retention would

19  not have been "productive" because "[t]he property had been so drastically modified from the

20  initial occurrence[.]" Dkt. No. 51-3 at 3–4; *see also id.* at 15–16 (Darbi Krumpos, Safeco's

21  structural expert, testified that "the conditions [of the property] were different than had existed at

22  the time the claim was submitted," and that Safeco asked her "to simply take a look at the

23  documents" because a site visit was not "going to benefit [the evaluation] in any way"). Lawless

24  instead reviewed Dunham's report, *see* Dkt. No. 22-3 at 3–14, and conducted a line-by-line

1    examination of the October 2020 estimate to determine, in his own opinion, the percentage of that

2    estimate attributable to the tenant's alterations. *See* Dkt. No. 45-8 at 7–8. He concluded that

3    approximately $50,000—or 22% of the estimate—could be fairly attributed to the tenant. *Id.* at 7;

4    Dkt. No. 49 at 11.

5         Plaintiffs thereafter asked Dunham to provide a scope of repair summary detailing the work

6    that, in his opinion, was reasonably necessary to repair the damage associated with the tenant's

7    alterations. *See* Dkt. No. 41 at 175–78. In his summary, Dunham opines that the July 2020

8    architectural and engineering plans and October 2020 estimate "includ[e] items that . . . are

9    unrelated to the unauthorized structural alterations undertaken by the tenant." *Id.* at 175.[9] Plaintiffs

10   also commissioned a new estimate from CJ McLeod Construction limited to the repairs attributable

11   to those alterations. *See* Dkt. No. 41 at 180 ("It is my opinion that the attached repair estimate . . .

12   accurately reflects on a more probable than not basis the cost to repair the unauthorized structural

13   alterations made by the tenant[.]"). This estimate, which totals $119,051.89, includes significantly

14   reduced budgets for several items. *Compare id.* at 144–45 (October 2020 estimate for foundation

15   work ($14,586), framing ($26,740), plumbing ($10,300), electrical ($18,100), roofing ($13,500),

16   siding ($9,100), windows and doors ($11,034), bathroom ($7,390), and kitchen ($26,750)), *with*

17   *id.* at 182–83 (March 2022 estimate for foundation work ($2,500), framing ($18,460), plumbing

18   (not listed), electrical ($11,950), roofing and chimney repair ($3,000), siding (not listed), windows

19   and doors (not listed), bathroom ($1,000), and kitchen (not listed)).

20

21

22

23

24

---

[9] Dunham characterizes the summary as "supplemental to the information and opinions contained in [his] original report of October 20, 2021." Dkt. No. 41 at 175; *see* Dkt. No. 22-3 at 6 (original report opining that the October 2020 estimate "appears to be a reasonable assessment of construction costs necessary to remediate the unauthorized structural alterations and comply with the City of Kirkland permitting requirements, except for minor amounts relating to line items for new appliances, cabinetry, and furnishings").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 10

1

<u>The Revised Estimate and the Parties' Pending Motions</u>

2
       On March 28, 2022, Plaintiffs provided Safeco with Dunham's scope of repair summary

3
and the new CJ McLeod Construction estimate. Dkt. No. 43 at 12. Safeco responded two months

4
later acknowledging receipt of these documents. Dkt. No. 41 at 186. The revised estimate, as well

5
as other information obtained during discovery, apparently confirmed Safeco's suspicion "that the

6
initial estimate submitted was unreasonable" and thus "justified [its] request for an inspection." *Id*.

7
Although Safeco believed that the March 2022 estimate still included work unrelated to the

8
tenant's alterations, it "nevertheless agree[d] to pay" the amount "as a complete cure to the

9
insured's IFCA complaint." *Id.* Safeco then sent Plaintiffs a check for $119,051.89. Dkt. No. 49 at

10
8. Plaintiffs promptly rejected the payment as "untimely and in violation of the IFCA statute," and

11
noted that such payment did not "immunize Safeco from owing the attorneys' fees, litigation costs,

12
treble damages, and other amounts recoverable under the statute[.]" *Id.* at 7.

13
       Safeco moved for summary judgment on all claims. Dkt. No. 40. Plaintiffs cross-moved

14
for partial summary judgment on only their IFCA claim. Dkt. No. 43.

15
## II.   DISCUSSION

16
       Plaintiffs' claims present several issues of fact that the Court may not resolve at this stage.

17
It is therefore particularly fitting to begin with the summary judgment standard before delving into

18
the merits of the dispute.

19
**A.   Summary Judgment Standard**

20
       Summary judgment is appropriate only when "the movant shows that there is no genuine

21
dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

22
Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

23
stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

24
evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

1    sided that one party must prevail as a matter of law." *Id.* at 251–52.

2        When parties file simultaneous cross-motions for summary judgment on the same claim,

3    the Court "must consider the appropriate evidentiary material identified and submitted in support

4    of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous.*

5    *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001); *see also*

6    *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (the district court

7    "rules on each party's motion on an individual and separate basis, determining, for each side,

8    whether a judgment may be entered in accordance with the Rule 56 standard." (cleaned up)). The

9    Court "giv[es] the nonmoving party in each instance the benefit of all reasonable inferences."

10   *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). However, to the extent

11   the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

12   that, where the facts specifically averred by that party contradict facts specifically averred by the

13   movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

14       The Court will enter summary judgment "against a party who fails to make a showing

15   sufficient to establish the existence of an element essential to that party's case, and on which that

16   party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

17   Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come

18   forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus.*

19   *Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis

20   omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific affidavits,

21   *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a genuine

22   issue of triable fact"; rather, the nonmoving party must "identify with reasonable particularity the

23   evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

24   (cleaned up).

1

**B.     IFCA**

2       IFCA authorizes a first-party claimant to an insurance policy "who is unreasonably denied

3   a claim for coverage or payment of benefits by an insurer" to bring an action for damages. Wash.

4   Rev. Code § 48.30.015(1); *see id.* § 48.30.015(2)–(3) (providing for treble damages and an award

5   of attorney fees and specified costs). There is an important caveat, though. The statute requires the

6   claimant to first "provide written notice of the basis for the cause of action to the insurer and office

7   of the insurance commissioner" 20 days prior to filing suit. *Id.* § 48.30.015(8)(a). Only if the

8   insurer "fails to resolve the basis for the action within the twenty-day period" may the claimant

9   "bring the action without any further notice." *Id.* § 48.30.015(8)(b). This 20-day window gives the

10   insurer an opportunity to cure any deficiencies or violations of the statute. *Norgal Seattle P'ship*

11   *v. Nat'l Sur. Corp.*, No. C11-0720-RSL, 2012 WL 1377762, at *4 (W.D. Wash. Apr. 19, 2012).

12       IFCA creates two circumstances under which an insurer may be liable: when it

13   unreasonably denies a claim for coverage or when it unreasonably denies a payment of benefits.

14   *Ainsworth v. Progressive Cas. Ins. Co.*, 322 P.3d 6, 20 (Wash. Ct. App. 2014); *Kifer v. Am. Fam.*

15   *Mut. Ins. Co.*, No. 13-6085-RJB, 2015 WL 12030068, at *4 (W.D. Wash. Feb. 10, 2015) (noting

16   that IFCA is written in the disjunctive). Plaintiffs assert both theories, although this case really

17   turns on the second—whether Safeco unreasonably denied payment of benefits.

18       1.     Safeco Did Not Unreasonably Deny Young's Vandalism Claim

19       Plaintiffs first contend that Safeco violated IFCA by unreasonably denying Young's

20   vandalism claim. Dkt. No. 43 at 13. This argument overlooks the purpose of IFCA's 20-day "cure"

21   window, which is to give the insurer a chance to remedy its initial, allegedly unreasonable coverage

22   determination. *See Norgal*, 2012 WL 1377762, at *4. The undisputed facts show that Safeco

23   accepted coverage of Young's vandalism claim within IFCA's 20-day window. Thus, the

24   reasonableness of Safeco's initial coverage determination is immaterial for purposes of IFCA. *See*

1    *Cardenas v. Navigators Ins. Co.*, No. C11-5578-RJB, 2011 WL 6300253, at *7 (W.D. Wash. Dec.

2    16, 2011) (there is no basis for an IFCA action when the insurer cures its purported violation).

3                    2.        Safeco Did Not Unreasonably Deny Payment of Benefits

4            Plaintiffs next argue that Safeco effectively denied payment of benefits by delaying

5    payment for nearly two years after it agreed to accept coverage. *See* Dkt. No. 43 at 15–17.

6    According to Plaintiffs, Safeco had 20 days to "resolve the basis" of Young's claim and it failed

7    to do so. *Id.* at 16–17; s*ee also* Dkt. No. 50 at 5 ("It should go without saying that a mere agreement

8    to pay some undisclosed amount, at some uncertain point in the future, does not 'resolve the basis'

9    of an IFCA claim.").

10           Safeco disagrees. It counters that Young is to blame for any delay in payment, as he denied

11   Safeco's repeated inspection requests and provided an inflated estimate two months after IFCA's

12   20-day window expired. Dkt. No. 48 at 13. In Safeco's view, Young's failure to cooperate or

13   otherwise tender a reasonable estimate of the repair costs forced it into litigation to obtain a fair

14   valuation. *See id.* at 14–16. Plaintiffs head off this argument by suggesting that Safeco could have

15   hired an expert back when it first accepted coverage to identify and value the repairs related to the

16   tenant's alterations. Dkt. No. 43 at 16–17. Nothing, they assert, prevented Safeco "from doing

17   what Safeco promised to do in November 2020—*i.e.*, to 'make its best estimate, based upon the

18   photos it took during its investigation, to identify those area[s of damage] that appear to have been

19   caused by the tenant['s vandalism], and pay for those damages accordingly.'" *Id.* at 17 (quoting

20   Dkt. No. 45-3 at 3 (alterations original)).

21           As an initial matter, Safeco was not required to pay Young's vandalism claim within the

22   20-day cure period because the parties disagreed over the value of the claim, *i.e.*, which repair

23   costs were related to the tenant's unauthorized alterations. "Where, as here, the delay in payment

24   is due to a dispute over the amount owed, the delay alone does not constitute a denial of payment

under IFCA." *Beasley v. State Farm Mut. Auto. Ins. Co.*, No. C13-1106-RSL, 2014 WL 1494030, at *6 (W.D. Wash. Apr. 16, 2014); *see also Jelinek v. Am. Nat'l Prop. & Cas. Co.*, 747 F. App'x 513, 515 (9th Cir. 2018) ("A delay in payment due to a good-faith dispute over the value of a claim does not amount to a denial of benefits under IFCA."); *Morella v. Safeco Ins. Co.*, No. C12-0672-RSL, 2013 WL 1562032, at *3 (W.D. Wash. Apr. 12, 2013) (when the insurer "mak[es] a good faith effort to appropriately value the loss, the fact that the insured did not immediately get all of the benefits to which [he] may ultimately be entitled does not establish an 'unreasonable denial of payment of benefits.'").

Moreover, an IFCA claim for denial of payment "cannot survive" when the insurer ultimately pays the claimant's full demand. *See Kenco Constr., Inc. v. Hartford Fire Ins. Co.*, No. 19-CV-01000-RAJ, 2020 WL 1433738, at *4 (W.D. Wash. Mar. 24, 2020) (collecting cases). This is true "even if an insurer's conduct is otherwise unreasonable." *Smith v. State Farm Mut. Auto. Ins. Co.*, No. C12-1505-JCC, 2013 WL 12107577, at *2 (W.D. Wash. Jan. 29, 2013); *see also id.* at *4 ("The reasonableness of Defendant's conduct is only relevant if there was a denial of coverage or payment; here, . . . Plaintiff concedes that she was paid the full amount of her policy one day after a jury verdict established her damages."); *Neyens v. Am. Fam. Mut. Ins. Co.*, No. C12-1038-JLR, 2012 WL 5499870, at *3 (W.D. Wash. Nov. 13, 2012) (holding that, "even if the court were to assume [the insurer's] behavior was unreasonable" during the 19-month delay in payment, the insured failed to plead facts sufficient to state an IFCA claim because the insurer ultimately paid the policy limit); *Hann v. Metro. Cas. Ins. Co.*, No. C12-5031-RJB, 2012 WL 3090977, at *9 (W.D. Wash. June 29, 2012) (finding no "denial" of payment where insurer paid full policy limit following trial, despite three-year delay between initial claim and resolution of suit.).

Plaintiffs' arguments to the contrary are unpersuasive. They analogize this case to *Morella*

1    and argue that, as in that case, Safeco effectively denied payment of benefits because it "offered

2    to pay a *per se* unreasonable amount—$0" for two years. Dkt. No. 50 at 6–7; *see Morella*, 2013

3    WL 1562032, at *3 ("Where the insurer pays or offers to pay a paltry amount that is not in line

4    with the losses claimed . . . and would not compensate the insured for the loss at issue, the benefits

5    promised in the policy are effectively denied."). But this analogy does not quite fit. Safeco did not

6    make a low-ball offer; indeed, it did not make any offer at all. It instead asked Plaintiffs to provide

7    an estimate, requested an inspection when Plaintiffs failed to promptly provide that estimate, and

8    then rejected the inflated estimate that Plaintiffs finally provided.[10]

9        The long line of federal case law requiring a denial of coverage or payment to support an

10   IFCA claim is in accord with the language of Section 48.30.015 of the Revised Code of

11   Washington. The plain language of the statute permits a first party claimant to sue when his insurer

12   "unreasonably denie[s] a claim for coverage or payment of benefits"—no further basis for a cause

13   of action is contained in Section 48.30.015(1). *See Smith*, 2013 WL 12107577, at *3. "To permit

14   an IFCA claim upon conduct that does not constitute a denial of coverage or payment, then, would

15   contravene the clear terms of the statute, even if unreasonable." *Id.*

16        IFCA's legislative history also supports this interpretation. Senator Weinstein, an original

17   sponsor of the bill, proposed an amendment that would have allowed a first party claimant to sue

18   when his insurer "unreasonably denie[s] *or delay[s]* a claim for coverage or payment of

19   benefits[.]" Wash. S. Amend., 2007 Reg. Sess. S.B. 5726 (Mar. 13, 2007) (emphasis added). After

20   working with constituents, Weinstein agreed to remove that language and submitted a

21

---

22   [10] Plaintiffs' strained analogy fails to account for Young's own foot-dragging, *i.e.*, refusing Safeco's inspection requests, taking months to provide an estimate, and—as noted—providing a significantly inflated estimate. *See*

23   *Bridgham-Morrison v. Nat'l Gen. Assurance Co.*, No. C15-927-RAJ, 2016 WL 2739452, at *4 (W.D. Wash. May 11, 2016) (a delay does not amount to a denial of payment under IFCA when the dispute is over the amount owed,

24   "particularly . . . where [the insurer] cannot assess the entirety of [the insured's] claimed damages without additional information").

1    corresponding proposed amendment. *See id.* (describing the effect of the amendment as follows:

2    "The act no longer addresses unreasonable delays in payment of insurance benefits."); *Hearing on*

3    *S.B. 5726 Before the H. Comm. On Insurance, Financial Services & Consumer Protection*, at 10–

4    11, 60th Leg., Reg. Sess. (Wash. March 22, 2007), available at

5    https://static1.squarespace.com/static/5ee54a704a364611375f042b/t/5ee5554efd12cf53ad3ab2f5/

6    1592087888349/Mar-22-2007.pdf (statement of Jean Leonard, Washington Insurers).[11] Thus,

7    IFCA's clear language and its legislative history support this district's repeated and consistent

8    conclusions that "an IFCA cause of action does not exist absent an unreasonable denial of coverage

9    or payment of benefits, even if an insurer's conduct is otherwise unreasonable." *See Smith*, 2013

10   WL 12107577, at *2.

11   Because Safeco paid Young the full amount of his estimate to repair the damage associated

12   with the tenant's alterations, it did not deny him payment or coverage for purposes of IFCA.

13   Therefore, the Court grants Safeco summary judgment on Plaintiffs' IFCA claim.

14   **C.    Breach of Contract**

15   Plaintiffs allege that Safeco breached its contractual duties under the Policy by initially

16

---

17   [11] Nor does the voters' pamphlet suggest that IFCA permits claims for unreasonable delay. *See Washington Voters*

18   *Pamphlet, General Election* 13–15 (Nov. 6, 2007), available at
     https://static1.squarespace.com/static/5ee54a704a364611375f042b/t/5ee5574fae359b2983cc1c17/1592088409243/g
     eneral-election-voters-pamphlet.pdf; *see also Perez-Crisantos v. State Farm Fire & Cas. Co.*, 389 P.3d 476, 481

19   (2017) ("This court has considered the official voter's pamphlet to determine the meaning of initiatives before.").
     Although the proponents' statement in the pamphlet indicates that IFCA will "mak[e] it against the law to

20   unreasonably *delay* or deny legitimate claims," the ballot title that would have been in front of voters as they voted on
     IFCA—which was drafted by the court—does not mention delay. *Compare Washington Voters Pamphlet, General*

21   *Election* 13 (Nov. 6, 2007), *with id.* at 15 (emphasis added); *see also White v. City of Stockton*, 244 Cal. App. 4th 754,
     763–64 (2016) (finding that the proponents' statement, "because of its contradiction to the measure's language, is the

22   least compelling evidence of intent" since "ballot pamphlet arguments are intended as advocacy pieces, and voters
     undoubtedly are aware that such arguments may tend to overstate or exaggerate the benefits or detriments of a
     proposition and often are written in broad rhetorical terms that do not necessarily reflect the specific language or effect

23   of the measure itself."). Similarly, the pamphlet's explanatory statement does not suggest that claimants would be able
     to sue for unreasonable delay under IFCA. *Washington Voters Pamphlet, General Election* 16 (Nov. 6, 2007); *see also*

24   *id.* at 13 ("The Explanatory Statement was written by the Attorney General as required by law and revised by the
     court.").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 17

denying coverage and failing to conduct a reasonable investigation of Young's vandalism claim. *See* Dkt. No. 50 at 8–12. "A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant." *Nw. Indep. Forest. Mfrs. v. Dep't of Labor & Indus.*, 899 P.2d 6, 9 (Wash. Ct. App. 1995).

1.   <u>Whether Safeco Breached the Policy by Initially Denying Coverage is an Issue of Fact</u>

Plaintiffs first contend that Safeco's initial coverage determination was based on an incorrect interpretation of the vandalism provision. *See* Dkt. No. 50 at 8–11. Under the Policy, Safeco agreed to cover any "direct physical loss" caused by "[v]andalism or malicious mischief" unless the loss is otherwise excluded under the General Exclusions. *See* Dkt. No. 41 at 209. The Policy does not define "vandalism" or "malicious mischief," although it specifically states that these terms do not include "loss by pilferage, theft, burglary or larceny." *Id.* at 209; *see also id.* at 217–18, 228–29 (definitions). General Exclusion 10 excludes from coverage any loss caused by "[p]lanning, [c]onstruction or [m]aintenance," a category further defined by the Policy as including "faulty, inadequate or defective . . . workmanship, repair, construction, renovation, [or] remodeling . . . of property . . . by any person or organization." Dkt. No. 41 at 212. Safeco's alleged breach of the Policy turns on whether the tenant's alterations are covered as vandalism or excluded as renovations. As discussed below, this is a factual dispute for the jury.[12]

---

[12] Plaintiffs argue in passing that Safeco "repeatedly admitted" that its initial coverage determination was unreasonable by later agreeing to cure its alleged IFCA violation and accepting coverage. Dkt. No. 50 at 8 ("Said another way, Safeco admitted that it was wrong when it denied the vandalism claim for lack of 'malicious intent.'"). They contend that Safeco should now be estopped from arguing otherwise. *Id.* Plaintiffs' position is based on a misreading of opposing counsel's correspondence. Although Safeco "agree[d] to cure and . . . accept coverage" for Young's vandalism claim, it did not "admit" that its initial coverage determination was wrong or unreasonable. Dkt. No. 41 at 132. Safeco resolved any lingering doubts as to the scope of its IFCA cure in its counsel's November 2020 letter: "With respect to the vandalism claim, . . . Safeco has not admitted it unreasonably denied the claim." Dkt. No. 45-3 at 2. Plaintiffs nonetheless pluck various phrases from the remainder of this letter as proof of Safeco's purported admission. *See* Dkt. No. 50 at 8. These are taken out of context. Safeco's counsel was clarifying the extent of its IFCA cure, that it was accepting coverage for the vandalism loss only, and that such damages did not entail a full-scale remodel. *See* Dkt. No. 45-3 at 2–3. It was not an admission of Safeco's breach or an agreement with Plaintiffs'

1

        a.     *Safeco's Initial Coverage Decision*

2

Safeco's claim file indicates that its on-site investigator found "no damage related to

3

vandalism," and "reiterated [the] difference between vandalism/malicious mischief [and]

4

wear/hard living/incomplete renovations" to Young during his inspection. Dkt. No. 14-1 at 22. As

5

particularly relevant here, the investigator explained to Young that there was "no evidence of

6

malicious intent related to [the] unauthorized home renovations," and thus excluded them from

7

coverage as "incomplete/unauthorized home renovations." *Id.*

8

Safeco's formal decision letter to Young thereafter confirmed that it was denying coverage

9

based on its determination that the claimed damages arose out of "wear, tear, deterioration,

10

construction renovation, remodeling, maintenance and rot." Dkt. No. 41 at 121. The letter

11

expressly reprinted General Exclusion 10. *Id.* at 122. In subsequent verbal communications with

12

Young, Safeco maintained its position that vandalism requires malicious intent: "When we inspect

13

rental houses we're looking for the intent to cause damage to the property[, i].e., all the cabinet

14

doors have been torn from the cabinets in the kitchen and bathrooms, the toilets and sinks are

15

smashed, drywall has been ripped from the walls." *Id.* at 125 ("Typically, when there is vandalism

16

to the property, the person does not buy drywall, install it and tape it for paint. This was a

17

remodel[.]").

18

19

---

definition of vandalism.

20

In a related—also passing—argument, Plaintiffs rely on two sentences in *Professional Recreation Organization, Inc.*
*v. National Union Fire Insurance Company*, No. C09-174-JLR, 2009 WL 10675771 (W.D. Wash. Sept. 25, 2009),

21

for the proposition that an insurer breaches its contract when it initially denies coverage and subsequently accepts
coverage based on no new information. *See* Dkt. No. 50 at 9; *see also Professional Recreation*, 2009 WL 10675771,

22

at *3. But *Professional Recreation* did not involve an IFCA claim, and the breaching insurer did not accept coverage
to cure an alleged IFCA violation. It simply changed its coverage determination several days after denial "based on

23

no new information." *Id.* Here, Safeco agreed to accept coverage to cure an alleged IFCA violation and presumably
avoid litigation. Thus, although it too shifted its coverage determination, it was not an admission of breach. And

24

Plaintiffs cite to no authority in support of their suggestion that an IFCA cure constitutes an admission of breach of
contract.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 19

b.    *Policy Interpretation and Vandalism Under Washington Law*

A few principles are worth outlining before the Court addresses this issue. First, the interpretation of an insurance policy is an issue of law. *Schwindt v. Underwriters at Lloyd's of London*, 914 P.2d 119, 122 (Wash. 1996). Washington courts "consider the insurance policy as a whole, giving the policy a fair, reasonable, and sensible construction as would be given to the contract by the average person purchasing insurance." *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 599 (Wash. 2016) (cleaned up). Where, as here, policy terms are undefined, they are given "their plain, ordinary, and popular meaning." *Queen City Farms, Inc. v. Cent. Nat'l Ins. Co.*, 882 P.2d 703, 712 (Wash. 1994); *see also Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 400–01 (Wash. 2013) (courts refer to standard English dictionaries to ascertain the plain meaning of undefined terms and, if the dictionary is unclear, courts can look to the common law and legal dictionaries). And finally, a coverage determination requires the Court to engage in a two-step process. "The burden first falls on the insured to show its loss is within the scope of the policy's insured losses. If such a showing has been made, the insurer can nevertheless avoid liability by showing the loss is excluded by specific policy language." *Overton v. Consol. Ins. Co.*, 38 P.3d 322, 329 (Wash. 2002) (internal citation omitted); *see also Nguyen v. Travelers Cas. Ins. Co.*, 541 F. Supp. 3d 1200, 1214 (W.D. Wash. 2021).

Washington courts have defined vandalism "as 'willful or malicious destruction or defacement of things of beauty or of public or private property.'" *Bowers v. Farmers Ins. Exch.*, 991 P.2d 734, 737 (Wash. Ct. App. 2000) (quoting Webster's Third New Int'l Dictionary 2532 (1993)). Webster's provides a nearly identical definition today: "willful or malicious destruction or defacement of public or private property." *Merriam-Webster.com Dictionary*, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/vandalism. Consistent with this disjunctive definition, the Washington Court of Appeals in *Bowers* rejected the insurer's

1   argument that vandalism requires a showing of malicious conduct. 991 P.2d at 737. As the court

2   explained, "[i]t is sufficient if the actor is guilty of wanton or intentional disregard of the rights of

3   others." *Id.* (noting that property has been damaged willfully and maliciously "if the damage

4   results from an intentional act from which damage was reasonably expected to result." (cleaned

5   up)); *see also Graff v. Allstate Ins. Co.*, 54 P.3d 1266, 1269 (Wash. Ct. App. 2002) ("The tenant's

6   acts were intentional, in disregard of Graff's property interest, and the resulting damage was almost

7   a certainty. This meets the definition of vandalism.").

8        Safeco launches an unpersuasive campaign to distinguish *Bowers* and *Graff*. It seeks to

9   cabin their general rule to situations in which a drug enterprise or other illicit activity causes the

10  loss. *See* Dkt. No. 40 at 17–18 ("Neither case involved innocent, but unauthorized, renovations to

11  improve the structure. Instead, the cases included destructive renovations to facilitate the illegal

12  drug activity."). According to Safeco, *Bowers* and *Graff* involved circumstances that "allowed the

13  court to infer intent to damage the property from the illegal activity which led directly to damage

14  to the structure." *Id.* at 18. And because this case does not involve illegal activity, so the argument

15  goes, there is nothing "from which the court c[an] infer an intent to damage property." *Id.* at 19.

16  This distinction overcomplicates and runs counter to an otherwise plain directive: vandalism does

17  not require a showing of malicious conduct.

18        The question is not whether an individual specifically intended to cause damage (or

19  whether such intent can be inferred); rather, it is whether the individual acted with "wanton or

20  intentional disregard of the rights of others," including by committing "an intentional act from

21  which damage was reasonably expected to result." *Bowers*, 991 P.2d at 737 (cleaned up). It is

22  therefore the act that must be intentional, not the damage. And the latter need only be a reasonably

23  foreseeable result of the act. This point deserves emphasis in light of Safeco's repeated arguments

24  that the record contains no evidence of the tenant's intent—malicious or otherwise—to cause

1    damage to the home. Dkt. No. 40 at 18.

2            c.      *The Jury Must Decide Whether the Tenant's Alterations are Covered as*
                     *Vandalism or Excluded as Renovations*

3

4            Viewing the facts in the light most favorable to Plaintiffs, the Court finds that there is

5    sufficient evidence for a reasonable juror to conclude that the tenant made modifications to

6    Young's property without his permission. Put differently, there is sufficient evidence to find that

7    the tenant committed intentional acts (altering the house) from which damage was reasonably

8    foreseeable. He tampered with the electrical wiring, demolished and rebuilt the bathroom, altered

9    the bedroom closets, sealed off entrances to the shared bathroom, erected walls to create a third

10   bedroom, removed portions of the chimney, removed doors, and altered other structural aspects of

11   the home. So long as the tenant made the alterations without permission, it does not matter whether

12   his conduct was malicious or whether he instead had honest intentions to improve the house. *See*

13   *Allstate Indem. Co. v. Lindquist*, No. C20-1508-JLR, 2022 WL 1607925, at *9 (W.D. Wash. May

14   20, 2022) ("It would be enough for the jury to conclude that, by entering the [insured dwelling]

15   without Mr. Lindquist's permission and purposefully using an open flame inside the home, they

16   committed an intentional act from which damage was reasonably expected to result." (cleaned

17   up)).

18           However, that Safeco premised its denial of coverage on a misconception of vandalism

19   under Washington law does not necessarily mean that the denial was a breach of the Policy, at

20   least on the facts of this case. The tenant's alterations are arguably excluded from coverage even

21   under a correct application of vandalism because a reasonable juror could conclude that they were

22   not done with wanton or intentional disregard for Young's property rights. That is, one could

23   conclude from the evidence that the tenant's alterations were authorized. *See, e.g.*, Dkt. No. 48 at

24   10–11 ("[The tenant] was renovating the home. He was licensed in construction and was living in

the house. There is absolutely no evidence that [the tenant] 'reasonably expected' that his labor was causing damage.").

Most tenants do not structurally modify their rental premises, let alone to the extent this tenant did, and especially not without express permission. And as Young repeatedly emphasized throughout the claims process, the lease agreement prohibits modifications to the property without his prior written consent. But even absent this contractual obligation, common sense suggests that a tenant would not invest his own time and money in a temporary residence in which he has no ownership interest—at least not to the extent that the tenant did here. If Young approved the changes, then the tenant's alterations were not made with wanton disregard for Young's rights and the tenant did not commit an intentional act from which damage was reasonably expected to result. And in that case, Safeco properly denied coverage because the alterations are excluded as faulty or inadequate renovations.

The jury must decide which version of the facts is true.[13] The Court therefore denies Safeco's motion for summary judgment on this aspect of Plaintiffs' breach of contract claim. The issue of damages also remains for trial. *See Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1161–62 (Wash. Ct. App. 2007) (finding triable issue of fact as to whether insured suffered damages as a result of insurer's breach of policy).

2.      Safeco's Investigation was Reasonable and Therefore Did Not Breach the Policy

Plaintiffs next allege that Safeco breached the Policy by failing to conduct a reasonable investigation before denying coverage. Dkt. No. 50 at 12. "Failure to adequately investigate, if proven, would constitute a breach of contract." *Wall v. Country Mut. Ins. Co.*, 319 F. Supp. 3d

---

[13] Safeco contends that Young's failure to cooperate excuses any breach. *See* Dkt. No. 40 at 19–21. Safeco fails, however, to explain how Young failed to cooperate before its initial denial of coverage (the alleged breach at issue). *See United States Fire Ins. Co. v. Icicle Seafoods, Inc.*, 572 F. Supp. 3d 1047, 1063 (W.D. Wash. 2021) (a party is excused from performance only *after* the other party materially breaches the contract).

1227, 1235 (W.D. Wash. 2018); *Coventry Assocs. v. Am. States Ins. Co.*, 961 P.2d 933, 938 (Wash. 1998) ("When an insurer fails to adequately investigate an insured's claim, the insured must either perform its own investigation to determine if coverage should have been provided or take no action at all. In either situation, the insured does not receive the full benefit due under its insurance contract.").

They argue that Safeco "effectively conceded that its original investigation was incomplete" by "repeatedly requesting a *second* inspection of the Rental Property long after it denied coverage[.]" Dkt. No. 50 at 12 (emphasis original). The Court disagrees. As Safeco points out, a second inspection would have been directed at quantifying the extent of the damages, whereas the initial inspection was primarily limited to determining whether the claimed loss was covered. Dkt. No. 40 at 19. Multiple inspections are often necessary to evaluate new or previously unknown damages while demolition and repair progresses. *Id.*; Dkt. No. 53 at 7; *see Bridgham-Morrison*, 2016 WL 2739452, at *6 ("[A]n insurer's initial investigation that does not identify every issue that contributed to the insured's claim does not show that [the] investigation was unreasonable[.]"); *GCG Assocs. LP v. Am. Cas. Co.*, No. C07-792-BHS, 2008 WL 3542620, at *10 (W.D. Wash. Aug. 8, 2008) (an insurer "is not required to undertake the most extensive investigation possible"; rather, it is "required to investigate claims in a reasonable manner before determining coverage").

Plaintiffs do not otherwise articulate how Safeco's investigation was deficient. *See Lakehurst Condo. Owners Ass'n v. State Farm Fire & Cas. Co.*, 486 F. Supp. 2d 1205, 1215 (W.D. Wash. 2007) (insured's "conclusory statements about the alleged unreasonableness of the investigations" was insufficient to defeat summary judgment). Nor does the record suggest that Safeco was anything but diligent. Its on-site investigator conducted a "thorough inspection" of the property, took numerous photographs, and spoke with Young during a full walk-through. *See* Dkt.

No. 14-1 at 22; Dkt. No. 41 at 84–115. Safeco also obtained a police report, and several representatives considered Young's request for reconsideration, the latter of which entailed reviewing the lease agreement, photographic evidence, and field report. *See* Dkt. No. 14-1 at 20–21; Dkt. No. 41 at 66–82. These efforts are not materially distinguishable from reasonable investigations in other cases. *See, e.g.*, *Anderson v. State Farm Mut. Ins. Co.*, 2 P.3d 1029, 1035 (Wash. Ct. App. 2000) (UIM claim investigation reasonable where insurer ordered police report, attempted to contact officer who wrote the report, photographed the car, took statements from those involved in the accident, and reviewed the insured's medical bills). That Safeco may have incorrectly determined coverage is not the definitive measure of a reasonableness. *See Lakehurst*, 486 F. Supp. 2d at 1214 ("Although [the insurers] may be ultimately incorrect in their determinations of no coverage, their prompt and thorough investigations were reasonable."). The Court grants summary judgment in favor of Safeco on this portion of Plaintiffs' breach of contract claim.

### D.   Bad Faith and CPA Claims

Plaintiffs predicate their bad faith and CPA claims on several alleged violations of Washington's insurance regulations. *See* Dkt. No. 1 at 6–7. Specifically, they allege that Safeco violated Washington Administrative Code §§ 284-30-330(1), -330(3), -330(4), -330(13), and -350(1). *Id.* Plaintiffs also base their bad faith claim on Safeco's alleged unreasonable denial of coverage. *See* Dkt. No. 50 at 14–16. The Court addresses these claims in turn, beginning with Safeco's denial of coverage.

#### 1.   Bad Faith

"Claims of insurer bad faith are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages proximately caused by any breach of duty." *St. Paul Fire & Marine Ins. Co. v. Onvia, Inc.*, 196 P.3d 664, 668 (Wash. 2008) (cleaned up). "[T]o succeed on

1   a bad faith claim, the policyholder must show the insurer's breach of the insurance contract was

2   unreasonable, frivolous, or unfounded." *Smith v. Safeco Ins. Co.*, 78 P.3d 1274, 1277 (Wash.

3   2003). Washington courts have repeatedly emphasized that the test for bad faith "is not whether

4   the insurer's interpretation [of the policy] is correct, but whether the insurer's conduct was

5   reasonable." *Wright v. Safeco Ins. Co.*, 109 P.3d 1, 10 (Wash. Ct. App. 2004); *see also Anderson*,

6   2 P.3d at 1033 ("The determinative question is reasonableness of the insurer's actions in light of

7   all the facts and circumstances of the case.").

8       Whether the insurer acted reasonably is often a question of fact. *Smith*, 78 P.3d at 1277;

9   *Hell Yeah Cycles v. Ohio Sec. Ins. Co.*, 16 F. Supp. 3d 1224, 1235 (E.D. Wash. 2014) ("Bad faith

10  claims generally raise fact issues preventing a determination on summary judgment."). But this is

11  not a free ticket to trial, as the insured "has the burden of proof" and "must come forward with

12  evidence that the insurer acted unreasonably." *Smith*, 78 P.3d at 1277; *Overton*, 38 P.3d at 329

13  ("Claims of bad faith are not easy to establish and an insured has a heavy burden to meet."). The

14  Court will therefore grant summary judgment "if reasonable minds could not differ that [the

15  insurer's] denial of coverage was based upon reasonable grounds." *Smith*, 78 P.3d at 1277. The

16  insurer's ability to point to a reasonable basis for its action is "significant evidence that it did not

17  act in bad faith and may even establish that reasonable minds could not differ that its denial of

18  coverage was justified." *Id.* at 1278.

19          a.   *Denial of Coverage*

20      The Court cannot say at this stage that *no* reasonable juror would find Safeco's denial of

21  coverage unreasonable, frivolous, or unfounded. *See id.* at 1277–78 (summary judgment is

22  inappropriate when "reasonable minds could differ that the insurer's conduct was reasonable, or if

23  there are material issues of fact with respect to the reasonableness of the insurer's action"). Safeco

24  contends that its coverage decision was correct and, even if it was not, "it can't be said that [its]

conduct was anything more than a reasonable, good faith mistake." Dkt. No. 40 at 22. Neither argument is persuasive.

Whether Safeco's denial of coverage is ultimately correct is not the relevant inquiry. *See Wright*, 109 P.3d at 10. The jury could find that the tenant's alterations are excluded under the Policy (and therefore find no breach of contract), *see* Section II.C.1.c, but nonetheless determine that Safeco acted unreasonably by premising its denial on a misapplication of vandalism. "An insurer's duty of good faith is separate from its duty to indemnify if coverage exists." *Coventry*, 961 P.2d at 937. That is why "[t]here is an abundance of case law that an insurance company can be held liable for bad faith and unreasonable conduct in the . . . denial of a claim even where it ultimately turns out that there was no coverage." *Wall*, 319 F. Supp. 3d at 1233. Again, the dispositive issue is whether the insurer's "denial of coverage was unreasonable *when it occurred*, not whether later developments could have vindicated [that] decision." *Fireman's Fund Ins. Cos. v. Alaska Pride P'ship*, 106 F.3d 1465, 1470 (9th Cir. 1997) (emphasis added).

Nor can the Court rule as a matter of law that Safeco's denial was a "reasonable, good faith mistake." Dkt. No. 40 at 22. A good faith mistake will not give rise to a bad faith claim so long as "the insurance company acts with honesty, bases its decision on adequate information, and does not overemphasize its own interests[.]" *Coventry*, 961 P.2d at 937–38; *See Pac. Coast Container, Inc. v. Royal Surplus Lines Ins. Co.*, No. C08-0278-MJP, 2008 WL 2705588, at *7 (W.D. Wash. July 8, 2008) ("An insured may not prevail on a bad faith claim when an insurer has made an honest, good faith mistake."). Plaintiffs argue that Safeco's denial is not a good faith mistake because it "inserted a 'malicious intent' requirement into the Policy's vandalism coverage" and "failed to consider prevailing case law to reach its coverage decision[.]" Dkt. No. 50 at 15. The record is unclear as to whether Safeco failed to consider controlling precedent or simply misunderstood it; either way, it based its coverage decision on the incorrect assumption that

1   vandalism requires malicious conduct. And, as the Court's discussion in Section II.C.1.b makes

2   clear, that assumption runs counter to at least two published opinions from the Washington Court

3   of Appeals. *See Bowers*, 991 P.2d at 737; *Graff*, 54 P.3d at 1269. Vandalism does not require a

4   showing of malicious conduct and that has been the law in Washington for the better part of two

5   decades.

6          Thus, Safeco's view was not an arguable interpretation of the law. *Cf. Perry v. Island Sav.*

7   *& Loan Ass'n*, 684 P.2d 1281, 1289 (Wash. 1984) ("[A]cts or practices performed in good faith

8   under an arguable interpretation of existing law do not constitute unfair conduct violative of the

9   consumer protection law."); *accord Rinehart v. Life Ins. Co. of N. Am.*, No. C08-05486-RBL, 2009

10  WL 2406333, at *2 (W.D. Wash. Aug. 4, 2009) ("[A]bsent consistent rulings at the trial level (or

11  a binding decision from a higher court) that ERISA does not apply to church-affiliated health plans

12  without an express election, the Court is unwilling to find that [the insurer's] representation of the

13  applicability of ERISA to a church-affiliated hospital plan was an unfair or deceptive practice[.]").

14  At the very least, a reasonable juror could find that Safeco's misguided reading of the law did not

15  provide a reasonable basis for denying coverage because it was "both frivolous and unfounded."

16  *Rizzuti v. Basin Travel Serv. of Othello, Inc.*, 105 P.3d 1012, 1020 (Wash. Ct. App. 2005). Safeco's

17  motion for summary judgment is denied with respect to this aspect of Plaintiffs' bad faith claim.

18  *See Merrill v. Crown Life Ins. Co.*, 22 F. Supp. 3d 1137, 1148 (W.D. Wash. 2014) (denying

19  summary judgment because a reasonable fact finder could conclude that insurer "had no reasonable

20  basis for partially denying coverage").[14]

21

22  ――――――――――――――――
    [14] Plaintiffs further allege that Safeco overemphasized its own interests "by refusing to fairly consider Mr. Young's

23  repeated requests for reconsideration." Dkt. No. 50 at 15. In their view, Safeco's request for a copy of the lease was "nothing more than an empty show designed to placate Mr. Young" because it "intended to deny coverage either way." *Id.* at 16. The Court disagrees. That Safeco confirmed its coverage decision upon review of the lease does not

24  mean that it failed to earnestly consider Young's arguments, or that its request for the lease was an "empty show designed to placate Mr. Young." Dkt. No. 50 at 16.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT SAFECO'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 28

An issue of fact also remains with respect to damages. *See Coventry*, 961 P.2d at 938–40 (first-party insureds are not entitled to a rebuttable presumption of harm upon a showing of bad faith; they must show that expenses were incurred as a result of the insurer's bad faith).

b.    *Insurance Regulations*

The Court next turns to Safeco's alleged violations of the insurance code. *See Rizzuti*, 105 P.3d at 1019 (a violation of the insurance code constitutes a breach of the insurer's duty of good faith). With one exception, Plaintiffs fail to show that Safeco violated these regulations.

(i)    Section 284-30-330(1) – Misrepresentation of Policy Provisions

Plaintiffs first claim that Safeco misrepresented pertinent facts and insurance policy provisions. Dkt. No. 1 at 6; *see* Wash. Admin. Code § 284-30-330(1). Safeco contends that it is entitled to summary judgment on this issue because the parties disagreed over "whether the [tenant's] renovations were vandalism," and a "misinterpretation of the policy is not a misrepresentation of policy provisions." Dkt. No. 53 at 9. The Court agrees. *See Indian Harbor Ins. Co. v. City of Tacoma Wash. Dep't of Pub. Utils.*, 354 F. Supp. 3d 1204, 1217 (W.D. Wash. 2018) ("There is no allegation that Indian Harbor misquoted facts or policy provisions, only that Indian Harbor takes a different view of whether there is actual coverage[.]"); *Jelinek v. Am. Nat'l Prop. & Cas. Co.*, No. C15-779-RAJ, 2016 WL 11782834, at *10 (W.D. Wash. Sept. 22, 2016) (insured failed to substantiate claim with any evidence that insurer's statement "was intentionally false"); *Bridgham-Morrison*, 2016 WL 2739452, at *9 (insurer did not misrepresent pertinent fact where it "actually h[e]ld th[e] belief" at issue). Safeco is entitled to summary judgment on this portion of Plaintiffs' claim.

(ii)    Section   284-30-330(3)   –   Implementation   of   Reasonable Investigatory Standards

Plaintiffs next contend that Safeco failed to adopt and implement reasonable standards for

1   the prompt investigation of Young's claim. Dkt. No. 1 at 6; *see* Wash. Admin. Code § 284-30-

2   330(3). As Safeco notes, however, Plaintiffs have not shown—or even attempted to show—that

3   its existing procedure for processing claims is unreasonable or otherwise deficient. Dkt. No. 53 at

4   10; *compare Reverse Now VII, LLC v. Oregon Mut. Ins. Co.*, No. C16-209-MJP, 2018 WL 646880,

5   at \*5 (W.D. Wash. Jan. 30, 2018) ("Plaintiff has not offered evidence . . . that Oregon Mutual

6   failed to implement reasonable standards for prompt investigation[.]"), *with Gamble v. State Farm*

7   *Mut. Auto. Ins. Co.*, No. 19-CV-05956-RJB, 2020 WL 5081706, at \*5 (W.D. Wash. Aug. 27, 2020)

8   (triable issue of fact as to whether insurer violated Section 284-30-330(3) where claims handler

9   was not trained to adjust Washington claims). The record instead indicates that Safeco promptly

10  handled Young's vandalism claim and rendered its coverage decision in a timely manner pursuant

11  to standard internal procedures. *See* Dkt. No. 14-1 at 2–24 (claim file). The Court grants Safeco

12  summary judgment on this portion of the claim.

13                    (iii)      Section 284-30-330(4) – Reasonable Investigation

14          Third, Plaintiffs argue that Safeco failed to conduct a reasonable investigation before

15  denying coverage. Dkt. No. 1 at 6; *see* Wash. Admin. Code § 284-30-330(4). "An insurer must

16  make a good faith investigation of the facts before denying coverage and may not deny coverage

17  based on a defense that [a] reasonable investigation would have proved to be without merit."

18  *Rizzuti*, 105 P.3d at 1020. Plaintiffs fail to articulate how Safeco's investigation was deficient or

19  otherwise explain what steps it should have taken but did not. *Cf. Lindquist*, 2022 WL 1607925,

20  at \*12 (insured did not explain how "Allstate's failure to take the investigative steps he identifie[d]

21  rendered its entire claim investigation unreasonable"). Nor, as discussed in Section II.C.2, does

22  the record indicate that Safeco's investigation was unreasonable. Indeed, the crux of this dispute

23  is not the sufficiency of Safeco's underlying investigation—it is Safeco's application of the

24  vandalism provision to the facts uncovered during that investigation. *See Bridgham-Morrison*,

2016 WL 2739452, at *7 ("Simply put, this is not a situation where the insurer unreasonably denied payment prior to *any* investigation while relying on mere suspicion or conjecture." (emphasis in original)); *Ayar v. Liberty Nw. Ins. Co.*, NO. C10-1788-JCC, 2012 WL 3144886, at *6 (W.D. Wash. Aug. 1, 2012) ("This is not a case where the insurer failed to investigate or did so only half-heartedly, instead basing its coverage decision on mere suspicion and conjecture." (cleaned up)). Safeco is entitled to summary judgment on this portion of Plaintiff's bad faith claim.

> (iv)   Section 284-30-330(13) – Reasonable Explanation of Basis for Denial

Plaintiffs also allege that Safeco failed to "promptly provide a reasonable explanation of the basis in the Policy in relation to the facts or applicable law for denial of Mr. Young's claim[.]" Dkt. No. 1 at 6; *see* Wash. Admin. Code § 284-30-330(13). This time the Court finds a triable issue of fact. This is so for two reasons.

First, Safeco's May 6, 2019 denial letter provides little to no explanation for its coverage decision. The letter summarily states that the Policy "does not afford coverage for damage(s) which arise out of wear, tear, deterioration, construction renovation, remodeling, maintenance and rot." Dkt. No. 41 at 121. It then includes two pages of uninterrupted Policy excerpts with no explanatory analysis. *See id.* at 121–23. Nowhere does Safeco discuss or proffer even a skeletal analysis in support of its decision to exclude the damages as renovations rather than covering them as vandalism. In fact, the letter does not even mention vandalism or the vandalism provision. Such a conclusory explanation "is tantamount to no explanation." *See Phillips v. USAA Ins. Co.*, No. 16-CV-0381-TOR, 2017 WL 1534198, at *4 (E.D. Wash. Apr. 27, 2017) ("Although USAA's offer of compromise gave some explanation in that it stated the offer represents the fair value of the claim, it provides no explanation (in relation to the facts or applicable law) as to why USAA purportedly believed that to be the value of the claim[.]").

1     Safeco's letter provides precisely the type of "explanation" that courts have condemned as

2   violative of the insurance code. *See Travelers Cas. & Sur. Co. v. Spectrum Glass Co., Inc.*, No.

3   C11-1324-JCC, 2012 WL 3780356, at *5 (W.D. Wash. Aug. 31, 2012) (insurer's letter insufficient

4   where it "merely listed the . . . claims and relief sought, identified various policy provisions and

5   two exclusions, and concluded summarily that the entire . . . action was not covered beyond

6   $100,000 in defense expenses."); *Truck Ins. Exch. v. Vanport Homes, Inc.*, 58 P.3d 276, 283

7   (Wash. 2002) (insurer's letter denying coverage "based on a laundry list of exclusions without any

8   analysis or correlation to the particular claims" supported finding of bad faith). True enough,

9   Safeco's on-site investigator gave Young some explanation for his initial decision to exclude the

10   damage as unauthorized renovations. *See* Dkt. No 14-1 at 22 (inspection summary indicating that

11   investigator "reiterated [the] difference between vandalism/malicious mischief [and] wear/hard

12   living/incomplete renovations," and "explained [that there was] no evidence of malicious intent

13   related to unauthorized home renovations"). But the jury can consider this in conjunction with the

14   May 2019 formal denial letter in deciding whether Safeco ultimately provided a "reasonable

15   explanation" for its coverage decision.

16     Second, and for the reasons just discussed in Section II.D.1.a, a reasonable juror could find

17   that Safeco's coverage explanation was unreasonable because it was based on an unreasonable

18   interpretation of the Policy's vandalism provision. *See Seaway Props., LLC v. Fireman's Fund*

19   *Ins. Co.*, 16 F. Supp. 3d 1240, 1254 (W.D. Wash. 2014) (insurer violated Section 284-30-330(13)

20   by basing its explanation on an unreasonable interpretation of the policy); *Hell Yeah Cycles*, 16 F.

21   Supp. 3d at 1234 (finding violation where insurer "provided little or inaccurate explanation" for

22   the basis of its denial). The Court denies Safeco's motion for summary judgment on this portion

23   of the claim.

24

(v)     Section 284-30-350(1) – Failure to Disclose Pertinent Policy Benefits, Coverages, and Provisions

Plaintiffs last claim that Safeco "failed to fully disclose to Mr. Young all pertinent benefits, coverages or other provisions of the Policy[.]" Dkt. No. 1 at 6; *see* Wash. Admin. Code § 284-30-350(1). Here again, however, Plaintiffs fail to articulate an argument (or support that argument with reference to facts in the record) identifying which benefits, coverages, or provisions Safeco allegedly failed to disclose. Nor does the record otherwise suggest that Safeco withheld or concealed any pertinent information from Young. *Accord Tavakoli v. Allstate Prop. & Cas. Ins. Co.*, No. C11-1587-RAJ, 2012 WL 6677766, at *5 (W.D. Wash. Dec. 21, 2012) (full disclosure of policy benefits, coverages, and provisions does not require the insurer to inform the insured of potential legal theories he might invoke to recover damages). The Court grants Safeco's motion for summary judgment on this portion of the claim.

2.     CPA

Plaintiffs base their CPA claim on alleged violations of the same five insurance regulations noted above. *See* Dkt. No. 1 at 7. To establish a CPA claim, a plaintiff must prove that (1) the defendant engaged in an unfair or deceptive act or practice (2) occurring in trade or commerce and (3) impacting the public interest that (4) injured the plaintiff's business or property and (5) was caused by the defendant. *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). A violation of an insurance regulation satisfies the first three elements of a CPA claim. *Hopkins v. Integon Gen. Ins. Co.*, No. C18-1723-MJP, 2020 WL 1467346, at *4 (W.D. Wash. Mar. 26, 2020); *Naxos, LLC v. Am. Fam. Ins. Co.*, No. C18-1287-JLR, 2020 WL 777260, at *22 (W.D. Wash. Feb. 18, 2020); *see also Cochrane v. Am. Guar. & Liab. Ins. Co.*, 471 F. Supp. 3d 1140, 1154 (W.D. Wash. 2020) ("[A]n insurer's 'bad faith constitutes a per se violation of the CPA.'" (quoting *Ledcor Indus. (USA), Inc. v. Mut. of Enumclaw Ins. Co.*, 206 P.3d 1255, 1262

(Wash. 2009))). As discussed in Sections II.D.1.a and II.D.1.b(iv), the jury must decide whether Safeco's denial of coverage was in bad faith and/or whether it violated Washington Administrative Code § 284-30-330(13).

## E.   Declaratory Relief

Plaintiffs' complaint lists declaratory relief as an independent cause of action. *See* Dkt. No. 1 at 4. They seek a declaration that

> (a) the Policy covers the . . . vandalism damage at the Rental Property; (b) Safeco's investigation of Mr. Young's insurance claim was unreasonable; (c) Safeco's denial of coverage was unreasonable, frivolous, or unfounded; (d) by virtue of its unreasonable investigation, unreasonable denial of coverage, and other acts, omissions, and breaches, Safeco waived any purported right to further adjust Mr. Young's insurance claim; (e) Mr. Young complied with all contractual obligations owed under the Policy; and (f) by virtue of Safeco's acts, omissions, and breaches, Mr. Young is excused from all conditions allegedly imposed by the Policy, including any purported obligation to allow Safeco to conduct a second inspection of the Rental Property or otherwise adjust Mr. Young's claim, or to accept any attempt by Safeco to belatedly cure its breaches.

Dkt. No. 1 at 5. "'Requests for declaratory judgment orders that merely impose the remedies provided for in other claims are duplicative and may be dismissed on that basis'; declaratory relief is not cognizable as an independent cause of action in such circumstances." *Segar v. Allstate Fire & Cas. Ins. Co.*, No. C21-1526-JLR, 2022 WL 102035, at *8 (W.D. Wash. Jan. 11, 2022) (quoting *Fosmire v. Progressive Max Ins. Co.*, No. C10-5291-JLR, 2010 WL 3489595, at *5 (W.D. Wash. Aug. 31, 2010)); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007) ("To the extent [plaintiff] seeks a declaration of defendants' liability for damages sought for his other causes of action, the claim is merely duplicative and was properly dismissed."). Here, Plaintiffs' declaratory judgment action "merely duplicates" their IFCA, breach of contract, bad faith, and CPA claims "because it requests the same kind of relief that may be sought in connection with those claims." *Segar*, 2022 WL 102035, at *8. The Court therefore grants Safeco summary judgment on this claim.

**F.      Attorney Fees**

One final matter remains. Safeco asks the Court to rule as a matter of law that Plaintiffs cannot recover attorney fees under IFCA, the CPA, or *Olympic Steamship Company, Inc. v. Centennial Insurance Company*, 811 P.2d 37 (1991). *See* Dkt. No. 40 at 23–24. The Court will do so with respect to Plaintiffs' IFCA claim because that claim fails as a matter of law. However, the Court cannot rule on the propriety of attorney fees under the CPA and *Olympic Steamship* because there are issues of fact with respect to those claims. The Court will cross that bridge should Plaintiffs prevail at trial. *See Gosney v. Fireman's Fund Ins. Co.*, 419 P.3d 447, 479 (Wash. Ct. App. 2018) (a prevailing party may recover attorney fees and costs under the CPA and *Olympic Steamship*); *but see Hougland v. Metro. Cas. Ins. Co.*, No. C21-5090 BHS, 2021 WL 2155049, at *2 (W.D. Wash. May 27, 2021) (the rule in *Olympic Steamship* is limited to those fees incurred to establish coverage; disputes over the value of a claim are not governed by the rule).

### III.      CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Safeco's Motion for Summary Judgment, Dkt. No. 40, and DENIES Plaintiffs' Motion for Partial Summary Judgment, Dkt. No. 43.

Dated this 2nd day of September, 2022.

Lauren King
United States District Judge